IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **RITA R. RADABAUGH** | * | CASE NO. : C-1-01-705 |
| Plaintiff | * | DISTRICT JUDGE SUSAN J. DLOTT |
| vs. | * | **PLAINTIFF'S LEGAL** |
| **CONTINENTAL CASUALTY CO.** | * | **MEMORANDUM** |
| Defendant | * | |

Now comes Plaintiff, Rita R. Radabaugh, and submits the following Legal Memorandum offering argument as to how the Court should consider the additional evidence submitted giving reasons why an Order granting judgment in favor of plaintiff is warranted.

One of the most important documents submitted as additional evidence is the operative record from plaintiff's surgery at Grant/Riverside Methodist Hospital performed by Thomas J. Hawk, M.D. on November 19, 1999. Plaintiff's pre-operative and post-operative diagnosis are the same: (1) cervical spinal stenosis with C6 radiculopathy and (2) left carpal tunnel syndrome. Doctor Hawk performed an anterior cervical discectomy and fusion C5-6 with allograft and left carpal tunnel release. The objective indications for this surgery included complaints of symptoms of cervical pain and radiation to the upper extremities, with the left being more involved than the right. She had changes not only of radiculopathy but those of myelopathy. M.R.I. showed evidence of a cervical spinal stenosis at the C5-6 level with foraminal stenosis in addition. Electro diagnostic studies showed a left carpal tunnel syndrome in addition to a right C7-C8 radicular pattern. Following surgery, the plaintiff was given specific restrictions

including wearing a soft collar while in bed and a hard (Thomas) collar when up, no lifting greater than ten (10) pounds, no exertion, and no driving. She was also instructed to wrap her left hand/wrist very loosely with Ace bandage for support.

This report not only contains objective medical evidence to support Doctor Malaya's restrictions, but it also clarifies those restrictions indicating that plaintiff is not to lift greater than ten (10) pounds and not to exert herself. These limitations clearly would prevent her from performing her work as a manager at Big Bear.

An MRI of the cervical spine was performed on October 29, 1998. This report revealed impingement noted in the anterior subarachnoid space at the C3-C4, C4-C5, C5-C6 and C6-C7 levels. This is most pronounced at the C5-C6 level and appears to be secondary to an element of disk bulging and/or posterior spurring. This report constitutes objective medical evidence of plaintiff's inability to perform her past work.

The report from Thomas J. Hawk, M.D. dated November 4, 1999, reports objective findings from a physical exam indicating weakness in plaintiff's external rotators in the left upper extremity as well as decreased sensation. Spurling's test caused pain at the base of the neck. DTR's are 1 to 2+ and roughly symmetrical in her upper extremities. In her lower extremities she has 3+ deep tendon reflex without evidence of clonus. She has no Hoffman's sign in the upper extremities and negative Brudzinski in the lower extremities. In addition, she has no clonus at the ankles. Doctor Hawk states that he believes that her findings are certainly compatible with a left C6 radiculopathy as well as the suggestion of a myelopathy secondary to cervical spondylosis and spinal canal stenosis.

Doctor Malaya's office visit dated 11/15/99 indicated that the plaintiff experiences pain

in her neck when turning around.

Doctor Malaya's office visit dated 1/13/00 found pain in "both calf arms."

In Doctor Malaya's office visit dated 4/7/00 he noted neck spasms.

Although outside the relevant time period, the MRI of the cervical spine dated 6/13/01 supports the fact that plaintiff had ongoing problems following her surgery revealing evidence of impingement in the anterior subarachnoid space noted at C4-C5 and C6-C7 levels consistent with some element of disk bulging and/or posterior spurring and there is some mild to moderate degree of canal stenosis identified at the C4-C5 and C6-C7 levels.

Doctor Malaya in his report dated June 5, 2002, summarizes plaintiff's condition and states his opinion that she continues to remain severely disabled and is unable to do any substantial gainful activity as a result of her disabling condition secondary to her cervical myelopathy secondary to spondylytic disease and cervical stenosis. Doctor Malaya's affidavit states that this was also his opinion prior to October 31, 2000.

Doctor Goodman's examination on October 13, 1998, revealed plaintiff has had complete abolition of her radial pulses with her arms held at her side and has a positive Tinel's sign at the left wrist. Based on her history and findings, Doctor Goodman found bilateral hand numbness, relative weakness of grip in both hands, and a modified positive Adson's test.

In his report dated December 14, 1998, Doctor Goodman indicated that the plaintiff's headaches were really posterior cervical pain since physical therapy. He indicated that her multilevel degenerative arthritis and spinal stenosis were the primary cause for most of her clinical symptoms as well as her right Thoracic Outlet and left Carpal Tunnel.

On January 29, 1999, Doctor Goodman found that the plaintiff was still clinically

symptomatic from her spondylosis.

Doctor Goodman indicated in his report dated November 12, 1998, that plaintiff's nerve conduction and EMG studies demonstrated early left Carpal Tunnel Syndrome and median nerve neuropathy as well as right Thoracic Outlet Syndrome. He advised her to stay off work and to rest her arm. He was hoping that at the end of four weeks she might be able to return to "light duty" work at Big Bear. Obviously, light duty does not include the type of work she was required to perform as a manager.

Although outside the relevant time period, Doctor Welsh reported on November 15, 2001, that on examination plaintiff's cervical range of motion is limited on all planes. She has tight tender nodules throughout the muscles of her cervical paraspinal region and bilateral trapezius regions. He stated he believed that plaintiff has persistent myelopathic symptoms, without myelopathic signs, status post decompression for severe cervical stenosis. He indicated that it has been his experience that this can be quite disabling despite adequate decompression at surgery. He indicates the plaintiff remains severely disabled and is not capable of any sustained "premunitive" activities at any time for the foreseeable future.

Doctor Novak in his report dated August 21, 2000, indicated that a neurological examination revealed pinprick, temperature and vibration was decreased distally below the ankles and symmetric fashion. He indicated that plaintiff has a progressive disorder affecting predominantly movement abilities with asymmetric onset and dystonic/myoclonic characteristics. Doctor Malaya in his affidavit indicated that dystonia is basically muscle spasms thereby confirming his findings of muscle spasms.

Doctor Goodman's nerve conduction report dated 1/27/00 indicated values below and

above normal.

Doctor Hawk indicated in a report dated 11/12/99 that the plaintiff would be off work for approximately eight weeks post operatively pending her progress.

Doctor Hawk indicated in a report dated January 28, 2000, that the plaintiff will continue to be off work until approximately 3/13/00 as she needs a complete physical therapy program prior to returning to work.

Doctor Hawk found in his report dated October 17, 2000, that the plaintiff still has weakness in the intrinsic muscles of both hands of a mild degree. Exam of the neck revealed tenderness to palpitation in the paravertebral cervical muscles contributing to her pain. He indicates that it takes very little activity "to stir things up."

Doctor Maniar in his report dated May 16, 2000, prescribed medication to help plaintiff with her pain and spasms.

Doctor Malaya in his office report dated 6/30/00 again noted an objective finding of neck spasms.

An CT of the head revealed mild atrophy.

The MRI of the head revealed evidence of mild sinusitis in the ethmoid and sphenoid sinuses.

Doctor Goodman in his report dated January 22, 1999, states that he previously gave the plaintiff a ten (10) pound lifting restriction. This lifting restriction is consistent with Doctor Hawk's ten (10) pound lifting restriction in his post operative report and consistent with Doctor Malaya's noted lifting restrictions. Doctor Goodman also notes that the plaintiff at work had to lift 32 pound weights from overhead downward and that this would certainly aggravate her

Thoracic Outlet and spondylitic condition.

In his report dated January 11, 2000, Doctor Hawk noted that a physical exam revealed that the plaintiff had numbness in the fourth and fifth fingers of her left hand as well as pain in the medial arm. He indicated that this was related to an ulnar neuropathy and that this would not have been something that would have responded to her carpal tunnel release. He also noted that the plaintiff continues to have some discomfort in the neck and left upper extremity.

On December 2, 1999, Doctor Hawk's physical examination revealed that the plaintiff had decreased sensation over the thumb, and he questioned whether it was related to the radiculopathy or the carpal tunnel syndrome.

Doctor Goodman noted in his report dated October 14, 1999, that the plaintiff's cervical MRI films demonstrated fairly uniform C5-C6 spinal stenosis and some degenerative disc disease at C6-C7. She still had signs of myelopathy. He also verified that she has restless legs probably due to cord irritation at night.

On October 19, 1998, Doctor Goodman's nerve conduction and EMG report noted findings compatible with left Carpal Tunnel Syndrome, left Median nerve neuropathy distally, right neurogenic Thoracic Outlet Syndrome, possible C7-C8 radicular disease.

An MRI of the cervical spine performed on October 12, 1999, revealed "bulging of the annulus fibrosus with hypertrophic endplate osteophytic changes as well as hypertrophic changes of the ligamentum flavum and posterior elements at the C5/C6 level is noted causing moderate impingement of the thecal sac at this level causing a moderate degree of spinal canal stenosis. There is some mild neural foraminal stenosis due to uncovertebral spurring on the left at this level and on the left at the C6/C7 level as well. The remaining neural foramina bilaterally are

widely patent." The diagnosis was spinal stenosis C5-6.

Doctor Goodman in his nerve conduction and EMG report - lower extremities dated 9/15/99 reported evidence of Posterior Tibial nerve neuropathy.

Doctor Malaya's Affidavit lists the objective findings which support his opinion that plaintiff was disabled and not able to perform her work as a manager trainee at Big Bear. This objective evidence includes medical records and reports already contained in CNA's file along with the additional medical evidence being submitted. He also clarifies plaintiff's limitations and restrictions. Specifically he states that plaintiff cannot lift more than 10 to 20 pounds. Since her job required lifting up to 80 pounds, it is clear that she could not perform this work. He also restricted her ability to stand/walk to up to 4 hours in an 8 hour day with 30 minutes to 1 hour without interruption, her ability to sit up to 4 hours in an 8 hour day with 30 minutes to 1 hour without interruption, and her ability to stoop or bend as only occasionally. In the Medical Assessment of Ability To Do Work Related Activities (Physical) completed by Doctor Malaya, he also noted restrictions on her ability to reach, handle, finger, feel, push and pull. All of these movements are required in plaintiff's job. Doctor Malaya also noted environmental restrictions of heights, moving machinery, handling chemicals, temperature extremes, and vibration.

In summary it is obvious from the additional evidence submitted that defendant failed to obtain important objective medical evidence including the operative report from plaintiff's neck and hand surgery, three MRIs of the cervical spine, physical examination reports by plaintiff's surgeon Doctor Hawk, relevant nerve conduction and EMG reports from Doctor Goodman, and an additional office note from Doctor Malaya confirming muscle spasms which makes at least two visits where muscle spasms were observed, among others. This new evidence along with the

evidence defendant already had in their file, provides the objective evidence needed to find that plaintiff could not perform her past work as a store manager trainee at Big Bear and is therefore entitled to long term disability.

Respectfully submitted,

Franklin T. Gerlach
Attorney for Plaintiff
No. 0019424
814 Seventh Street
Portsmouth, OH 45662
Phone 740-354-7755
Fax 740-354-6496

## CERTIFICATE OF SERVICE

A copy of the foregoing Plaintiff's Legal Memorandum has been sent by ordinary mail this _____ day of July, 2003, to Philip F. Brown, Attorney for Defendant, to his office at Brenner, Brown, Golian & McCaffrey Co., L.P.A., 2109 Stella Court, Columbus, Ohio 43215.

Franklin T. Gerlach
Attorney for Plaintiff