IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Rita RADABAUGH

    Plaintiff,

vs.                                                                                                  Civil Action No.  C-1-01-705

CONTINENTAL CASUALTY COMPANY,                                   Judge:  Hon. Susan J. Dlott

    Defendant.

---

**CONTINENTAL CASUALTY COMPANY'S
LEGAL MEMORANDUM OPPOSING PLAINTIFF'S
SUBMISSION OF ADDITIONAL EVIDENCE**

**I.     INTRODUCTION**

In its Order holding the parties' cross-motions for judgment in abeyance, this Court permitted Plaintiff to "submit any additional medical evidence created prior to October 31, 2000 in support of her claim that she was disabled under the Plan."  (Order, p. 20)  Plaintiff has now submitted additional medical evidence for review.  Upon review of the pertinent medical evidence, Continental Casualty's decision to deny benefits in this case was rational and therefore should be upheld under the arbitrary and capricious standard of review.

**II.    THE ADDITIONAL EVIDENCE PROVIDED FAILS TO PROVIDE AN OBJECTIVE BASIS FOR PLAINTIFF'S COMPLAINTS**

Much of what Plaintiff purports to be additional evidence is actually contained in the administrative record.  Specifically, Exhibits 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 50 to the Submission of Additional Evidence are, in fact, contained in the administrative record.[1]  Moreover, in contravention of

---

[1] Exhibit 2 is found at Administrative Record ["AR"], pp. 071, 081-82; Exhibit 3 at AR 116-17; Exhibit 4 at AR 118-19; Exhibit 6 at AR 120-21; Exhibit 7 at AR 123; Exhibit 8 at AR 129-30; Exhibit 9 at AR 131-32; Exhibit 10 at AR 136-37; Exhibit 11 at AR 139-40; Exhibit 12 at AR 083-84, Exhibit 13 at AR 087; Exhibit 14 at AR 085-86; and Exhibit 50 at AR 129-30.

1

this Court's order, Plaintiff has submitted several exhibits that consist of medical evidence created after October 31, 2000.[2] Exhibits 15, 16, 17, and 23 were all created after October 31, 2000, and this Court specifically limited Plaintiff to submission of "any additional medical evidence created prior to October 31, 2000" in its Order. Because the exhibits outlined above are either contained in the administrative record already reviewed by this Court or specifically prohibited by this Court's Order, it is unnecessary to address them here.

The exhibits attached to Plaintiff's Submission of Additional Evidence that are in compliance with this Court's Order and not contained in the administrative record begin with an MRI of Plaintiff's head performed September 16, 1998. (Plaintiff's Submission of Additional Authority Exhibit ["PSA"] 37) The results of that MRI were listed as, "No intracranial lesion is seen. There is evidence of mild sinusitis in the ethmoid and sphenoid sinuses." (PSA 37)

A letter from Dr. Goodman to Dr. Malaya dated October 13, 1998 noted that Plaintiff complained of "loss of hand control" and "numbness." (PSA 18) Dr. Goodman performed an EMG on October 19, 1998, which indicated that the study was "compatible with left Carpal Tunnel Syndrome, left Median nerve neuropathy distally, right neurogenic Thoracic Outlet Syndrome, possible C7-C8 radicular disease. Based on these studies, MRI of the cervical spine will be obtained." (PSA 43) The MRI of the cervical spine was performed October 29, 1998, indicating "some impingement on the anterior subarachnoid space identified at the C3-C4, C4-C5, C5-C6, and C6-C7 levels" but "no evidence of focal disk herniation." (PSA 5)

Dr. Goodman wrote to Dr. Malaya again on November 12, 1998. (PSA 22) Dr. Goodman advised that Plaintiff "has degenerative disc disease of the cervical spine between C5 and C7, left Carpal Tunnel Syndrome with median nerve neuropathy and right Thoracic Outlet Syndrome." (PSA 22) Dr. Goodman planned to keep Plaintiff "off work for one month … to rest her arm." (PSA 22) Dr.

---

[2] Continental Casualty has filed a Motion to Strike these Exhibits contemporaneously herewith. This Court should not consider such evidence because the Sixth Circuit Court of Appeals mandates that the evidence to be considered upon review of an administrator's decision is limited to the administrative record, and such evidence was created after the administrative review process was closed. As such, consideration of such evidence is inappropriate.

Goodman wrote back to Dr. Malaya on December 14, 1998 indicating that Plaintiff "reports that numbness in the right arm continues and in her left arm she says that wearing the carpal tunnel splint has definitely reduced some of the symptoms." (PSA 19)

On January 22, 1999, Dr. Goodman stated that Plaintiff "reports to me that when she was here the last time after I gave her the 10# lifting restriction and told her to return to work her company told her that she could not go to work because if she injured herself again the workmen's compensation people would not pay for it." (PSA 38) As of January 29, 1999, Dr. Goodman reported that Plaintiff's "symptoms remain about the same at this point." (*Id.*)

The additional medical records provided next reveal that an EMG and nerve conduction study of both lower extremities was performed September 15, 1999. (PSA 48-49) The impression of that study stated, "This study shows evidence of very mild Posterior Tibial nerve neuropathy. All other findings are within the range of normal. It does not appear that that mild slowing in the Posterior Tibial nerves is the cause of her tripping." (PSA 48) Somatosensory Evoked Potentials ("S.S.E.P.") studies of the upper and lower extremities were performed October 8, 1999. (PSA 46-47) The S.S.E.P. study of the lower extremities indicated "Normal SSEP lower extremities." (PSA 47) The result of the S.S.E.P. of the upper extremities stated, "Normal Somatosensory Evoked Potentials of the upper extremities." (PSA 46) An MRI of the cervical spine performed on October 12, 1999 yielded the following impression:

> Bulging of the annulus fibrosus with hypertrophic endplate osteophytic changes as well as hypertrophic changes of the ligamentum flavum and posterior elements at the C5/C6 level is noted causing moderate impingement of the thecal sac at this level causing a moderate degree of spinal canal stenosis. There is some mild neural foraminal stenosis due to uncovertebral spurring on the left at this level and on the left at the C6/C7 level as well. The remaining neural foramina bilaterally are widely patent.

(PSA 45)

Dr. Goodman wrote to Dr. Malaya on October 14, 1999 indicating that he asked Plaintiff "to see Dr. Hawk in Columbus for a second opinion." (PSA 42) Dr. Goodman reported that he "still ha[s] no

explanation for her bilateral posterior tibial nerve neuropathies and will look to Dr. Hawk for some suggestions for further workup." (PSA 42)

On November 12, 1999, Dr. Hawk wrote a "To Whom It May Concern" letter indicating that Plaintiff was "under my care for cervical spinal stenosis and carpal tunnel syndrome. She will be undergoing surgery on 11/19/99 for these problems. She will be off of work for approximately 8 weeks postoperatively pending her progress." (PSA 26) Dr. Malaya examined Plaintiff on November 18, 1999, diagnosing her with "Left Carpal Tunnel Syndrome, Left C6 Radiculopathy – Spinal Stenosis." (PSA 35)

On November 19, 1999, Plaintiff underwent an anterior cervical discectomy and fusion C5-6 with allograft left carpal tunnel release performed by Dr. Hawk. (PSA 1) After the procedure, Plaintiff "was then sent to recovery room in good condition." (PSA 1) Dr. Hawk wrote to Dr. Goodman after examining Plaintiff post surgery on December 2, 1999. (PSA 41) Dr. Hawk noted, "the incision is healing nicely. On her examination today I find that her strength has improved in the external rotators on the left shoulder and she has a strong biceps jerk on the left. She has decreased sensation over the thumb and it is a question if that is related to the radiculopathy or the carpal tunnel syndrome." (PSA 41)

Dr. Hawk saw Plaintiff again on January 11, 2000. (PSA 40) Dr. Hawk reported that Plaintiff claimed to have "numbness in the fourth and fifth fingers of the left hand as well as pain in the medial arm. I believe this is related to an ulnar neuropathy and this would not have been something that would have responded to her carpal tunnel release. She has noted that the sensation of the hand otherwise is improved and I find that she has good strength in the short abductor muscle of the thumb of the left hand." (PSA 40) Dr. Hawk further noted that Plaintiff's "proximal muscles are quite strong and there is nothing to suggest any residual weakness in the biceps or external rotators in the left shoulder. I find that her sensation over the thumb is about equal to that on the right side. Her surgical wound is healing nicely. Nonetheless, Rita continues to have some discomfort in the neck and left upper extremity." (PSA 40) Dr. Hawk planned to get an x-ray of the cervical spine. (PSA 40)

4

On January 19, 2000, Dr. Goodman wrote to Dr. Hawk to advise that he reviewed Plaintiff's EMG studies from October 1998 "and found that her nerve conduction velocity across the elbow in the left arm was 57.9 meters per second, which was well within the range of **normal**. Her right arm was 46.6 meters per second, which I still consider **normal**." (PSA 39, emphasis added)  Dr. Hawk wrote another "To Whom It May Concern" letter on January 28, 2000, indicating that Plaintiff "will continue to be off work until approximately 3/13/00 as she needs to complete a physical therapy program." (PSA 27)

The next additional record indicates that Dr. Maniar wrote to Dr. Malaya on May 16, 2000. (PSA 29)  Dr. Maniar noted that Plaintiff's rheumatoid factor and acetylcholine receptor antibody work up was normal. (PSA 29)  Dr. Maniar further indicated that Plaintiff had told him that she had been told that she has dystonia. (PSA 29)  Dr. Maniar then noted that Plaintiff was "complaining of some numbness in the hands.  However, my exam didn't suggest any decreased sensation.  Neuro exam was unchanged from before.  I **didn't see any weakness in the extremities, and there was no cogwheel rigidity seen**." (PSA 29, emphasis added)  Dr. Malaya examined Plaintiff on May 19, 2000 indicating that her head, neck, chest and extremities were all "ok" and that the neurological exam was "intact." (PSA 31)

Dr. Malaya noted Plaintiff had a headache on June 30, 2000. (PSA 32)  Plaintiff underwent a CT scan of her head on July 11, 2000. (PSA 36)  The impression of that scan was "**Mild** atrophy without evidence of acute intracranial hemorrhage." (PSA 36, emphasis added)  Upon examining Plaintiff on July 14, 2000, Dr. Malaya noted Plaintiff's head, neck and extremities were "ok." (PSA 33)  Plaintiff's head, neck, and extremities all remained "ok" on examination dated August 11, 2000. (PSA 34)

Dr. Peter Novak of the Ohio State University Medical Center Movement Disorders Clinic wrote to Dr. Malaya after examining Plaintiff on August 21, 2000. (PSA 24)  Dr. Novak noted "EMG's repeated **normal**, MRI of the c-spine showed stenosis, followed surgery at Riverside, MRI of the brain 2 years ago at Portsmith **normal**.  Lyme's disease tests were **negative**.  EEG **normal** 4 years ago." (PSA 24)  Dr. Novak reported his physical examination as follows:

> Sitting blood pressure 122/80, pulse 76, respiratory rate 12.  Appearance appropriate for age, no skeletal deformities.  Eyes without redness and exudates, optic discs sharp, no vessel changes in the posterior segment.  Ears and nose within normal limits, mouth and throat exam showed wet mucous membranes, without exudates.  Cardiovascular examination without carotid bruit, distinct S1, S2 without additional murmur, peripheral vascular system without swelling and varicosities, on palpation positive pulse at both tibial arteries.  Respiratory examination showed clear breathing sounds.  Abdomen was soft with positive bowel sounds.  Musculoskeletal system was without skeletal deformities.  Skin was clear without rash.  Psychiatric examination was without evidence of depression, anxiety or psychosis.  Hematologic and lymphatic system was without palpable lymphatic nodes, hematomas or bruising.

(PSA 24)  Dr. Novak then noted that a diagnoses "differential is wide and **may include** neurodegenerative disorders such as Parkinson's syndromes, various forms of dystonia, Huntington chorea or metabolic disorders."  (PSA 24, emphasis added)  Dr. Novak planned to proceed with a work up to determine Plaintiff's problems.  (*Id.*)

Dr. Hawk wrote to Dr. Malaya on October 17, 2000 after seeing Plaintiff on follow-up examination.  (PSA 28)  Dr. Hawk noted "***significant improvement*** I think since her surgery."  (PSA 28, emphasis added)  Dr. Hawk further noted as follows

> I find that she still has some weakness in the intrinsic muscles of both hands of a mild degree but that the ***sensation appears to be back to normal***.  The C6 dermatome impairment has ***resolved*** in that I don't see numbness in the thumb of either hand and she has good strength in the proximal muscles namely the biceps and external rotators.  She has a ***negative Spurling's sign*** to either side.  The other proximal muscles appear ***quite strong***.  In the lower extremities, she ***does pick up temperature, pin, vibration and light touch equally well when comparing the right and left sides***.  ***DTR's are good*** 2+ at the knees which I think is a bit better than what they were prior to her surgery.  She has ***no clonus*** at the ankles.

> On examination of the neck, she does have some tenderness to palpation in the paravertebral cervical muscles there is an element of that contributing to her pain.  Since she has not returned to work, Rita feels a bit better.  It takes very little in the way of activity to stir things up.

> I do not see any reason to believe that she is a candidate for any surgical procedures.  I think just good conservative management is what she needs at this time.

(PSA 28)

Plaintiff also submitted an affidavit from Dr. Malaya indicating that Plaintiff "was totally disabled from 11/19/99 through the present." (Malaya Aff., ¶ 5) Dr. Malaya stated that his opinion was based on (1) the October 29, 1998 MRI of the cervical spine; (2) the Nerve Conduction and EMG report dated October 19, 1998; (3) the November 19, 1999 operative record; (4) the MRI of the cervical spine performed October 12, 1999; (5) "examination reports from consultative physicians," (6) Dr. Hawk's physical examination on November 4, 1999 noting "weakness in her external rotators in the left upper extremity as well as decreased sensation. Spurling's test causes pain at the base of the neck without radicular component;" (7) Dr. Novak's report of August 21, 2000; (8) Dr. Maniar's letter dated May 16, 2000; and (9) physical examination notes of April 7, 2000 and June 30, 2000. (Malaya Aff., ¶ 3)

Continental Casualty submitted the additional evidence to Dr. Truchelut for review. (Affidavit of Dr. Truchelut, attached hereto) Dr. Truchelut reviewed all of the additional medical records submitted by Plaintiff to this Court. (Truchelut Aff., ¶ 6) Dr. Truchelut opines that the October 29, 1998 MRI of the cervical spine, the Nerve Conduction and EMG report of October 19, 1998, the MRI performed October 12, 1999, Dr. Hawk's physical examination of November 4, 1999, and the November 19, 1999 operative record fail to provide objective medical evidence to support Plaintiff's claim of continued disability beyond the initial recovery period for the November 19, 1999 operation. (Truchelut Aff., ¶ 10) Such records do not provide objective medical evidence of a post-surgery disability. (Truchelut Aff., ¶ 11)

As to Dr. Novak's August 21, 2000 report, Dr. Truchelut felt that Dr. Novak's "very detailed physical and neurological examinations revealed no abnormalities, except for slightly increased motor tone on the right side, symmetrical decreased sensory testing below the ankles and spontaneous myoclonic-type twitches affecting the face bilaterally. Dr. Novak felt that the differential diagnosis was extensive, including possible movement disorder or metabolic problem. He ordered additional testing and prescribed pramipexole. Dr. Novak failed to indicate any definitive objective cause for Plaintiff's complaints, and his report indicates only that he would pursue additional testing." (Truchelut Aff., ¶ 13)

Dr. Truchelut also addressed Dr. Maniar's May 16, 2000 letter. (Truchelut Aff., ¶ 14) Upon reviewing that letter, Dr. Truchelut concluded, "Dr. Maniar's examination was negative" and that "Dr. Maniar's May 16, 2000 letter demonstrates he could find no objective cause for Plaintiff's complaints." (Truchelut Aff., ¶ 15)

Dr. Truchelut further reviewed the examination notes of Dr. Malaya. (Truchelut Aff., ¶ 16) Although Dr. Malaya did note that Plaintiff complained of some neck spasms in the notes of his April and June 2000 examinations, by July 14, 2000, Dr. Malaya noted Plaintiff's head, neck and extremities were "ok." (Truchelut Aff., ¶ 17) Plaintiff's head, neck, and extremities all remained "ok" on examination dated August 11, 2000. (Truchelut Aff., ¶ 17) Moreover, Dr. Truchelut further noted that "the 10/17/00 examination by Dr. Hawk yielded a fairly normal physical examination." (Truchelut Aff., ¶ 17)

Dr. Truchelut concludes, "Although the claimant reports persistent symptoms post-surgery on her neck and carpal tunnel, there are no physical, radiological or electrodiagnostic findings to support a significant functional impairment. This is essentially a subjective claim based on the available medical records." (Truchelut Aff., ¶ 18-19)

This Court has already determined that "[u]nder the law of the Sixth Circuit, it is not inherently arbitrary or capricious to require an employee benefits claimant to provide objective evidence of her condition." (5/13/03 Order, p. 14-15) Moreover, this Court has recognized that Continental Casualty's "apparent interpretation of the term '[o]bjective' to exclude conclusions and recommendations of a claimant's physician – where CNA saw no objective medical basis for those conclusions and recommendations – is also neither arbitrary nor capricious." (5/13/03 Order, p. 15) This Court specifically concluded that the information contained in the administrative record failed to provide sufficient objective medical evidence to support Plaintiff's allegations of disability. (*Id.*)

A review of the additional medical evidence provided upon which Dr. Malaya and his patient rely, demonstrates that the bulk of such evidence was created prior to Plaintiff's surgery to correct such

8

problems in November 1999. The October 29, 1998 MRI of the cervical spine, the Nerve Conduction and EMG report of October 19, 1998, the MRI performed October 12, 1999, Dr. Hawk's physical examination of November 4, 1999, and the November 19, 1999 operative record simply fail to provide objective medical evidence to support Plaintiff's claim of continued disability beyond the initial recovery period for the November 19, 1999 operation. (Truchelut Aff., ¶ 10) For example, Dr. Malaya relies on Dr. Hawk's notation on November 4, 1999 that "Spurling's test causes pain at the base of the neck without radicular component;" however, post surgery Dr. Hawk re-examined Plaintiff and found a "***negative Spurling's sign*** to either side" as of October 17, 2000. (PSA 28) Dr. Hawk's examination as of October 17, 2000 demonstrates that Plaintiff's pre-surgery condition had been significantly improved by the operation, and there is a lack of objective evidence supporting a post surgery disability. (PSA 28)

The only post-surgery evidence that Dr. Malaya relies upon is the Dr. Novak's report of August 21, 2000, Dr. Maniar's letter dated May 16, 2000, and Dr. Malaya's physical examination notes of April 7, 2000 and June 30, 2000. (Malaya Aff., ¶ 3) Dr. Novak's report provides absolutely no objective evidence of any condition. Instead, Dr. Novak merely noted "EMG's repeated ***normal***, MRI of the c-spine showed stenosis, followed surgery at Riverside, MRI of the brain 2 years ago at Portsmith ***normal***. Lyme's disease tests were ***negative***. EEG ***normal*** 4 years ago." (PSA 24, emphasis added) Dr. Novak never came to a conclusion as to what exactly was wrong with Plaintiff concluding only that Plaintiff's diagnoses "***may include*** neurodegenerative disorders such as Parkinson's syndromes, various forms of dystonia, Huntington chorea or metabolic disorders," and indicating that he would begin testing. (PSA 24, emphasis added) Dr. Novak's "very detailed physical and neurological examinations revealed no abnormalities," and "Dr. Novak failed to indicate any definitive objective cause for Plaintiff's complaints, and his report indicates only that he would pursue additional testing." (Truchelut Aff., ¶ 13)

Dr. Maniar's letter of May 2000 indicated only that Plaintiff had told him that she had been told that she has dystonia. (PSA 29) Dr. Maniar further noted that Plaintiff was "complaining of some

9

numbness in the hands.  However, my exam ***didn't suggest any decreased sensation***.  Neuro exam was ***unchanged*** from before.  I ***didn't see any weakness in the extremities, and there was no cogwheel rigidity seen***."  (PSA 29, emphasis added)  As such, Dr. Maniar's letter provides no objective support for Plaintiff's allegations.  In fact, "Dr. Maniar's May 16, 2000 letter demonstrates he could find no objective cause for Plaintiff's complaints."  (Truchelut Aff., ¶ 15)

Finally, Dr. Malaya's notations that Plaintiff complained of neck spasms in April and June 2000, are countered by his examinations later in July and August, which both noted that head, neck and extremities were "ok."  (PSA 33, 34; Truchelut Aff., ¶ 17)  Moreover, Dr. Truchelut further noted that "the 10/17/00 examination by Dr. Hawk yielded a fairly normal physical examination."  (Truchelut Aff., ¶ 17)  Accordingly, such neck spasms fail to present any objective medical evidence of a continuing disability.

Upon review of the additional medical evidence provided, it is clear that Dr. Malaya's conclusions and recommendations were not objectively verified, and Continental Casualty thus reasonably discounted them in favor of Dr. Truchelut's independent opinion, and the examinations of Dr. Maniar and Dr. Hawk.  As such, Continental Casualty's decision should be upheld under the arbitrary and capricious standard of review.

Respectfully submitted,

*/s/ Philip F. Brown*
Philip F. Brown (0030809) pbrown@rrcol.com
Michael E. Heffernan (0069851) mheff@rrohio.com
Brenner, Brown, Golian & McCaffrey Co., LPA
2109 Stella Court
Columbus, Ohio 43215
(614) 258-6000
(614) 258-6006 fax
Trial Counsel for Defendant

10

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2003, a copy of the foregoing Legal Memorandum Opposing Plaintiff's Submission of Additional Evidence was filed electronically. Notice of this filing will be sent to all parties listed below by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Philip F. Brown*
Philip F. Brown
Michael E. Heffernan

Franklin T. Gerlach
814 Seventh Street
Portsmouth, Ohio 45662
Attorney for Plaintiff