IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FILED
KENNETH J. MURPHY
CLERK

03 OCT -8 AM 9:18

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

Rita RADABAUGH

    Plaintiff,

vs.                                                                                              Civil Action No. C-1-01-705

CONTINENTAL CASUALTY COMPANY,                           Judge: Hon. Susan J. Dlott

    Defendant.

**AFFIDAVIT OF EUGENE TRUCHELUT, M.D. IN SUPPORT OF
DEFENDANT'S LEGAL MEMORANDUM OPPOSING PLAINTIFF'S
SUBMISSION OF ADDITIONAL EVIDENCE**

Philip F. Brown (0030809)
Michael E. Heffernan (0069851)
Brenner, Brown, Golian &
McCaffrey Co., LPA
2109 Stella Court
Columbus, Ohio 43215
(614) 258-6000
(614) 258-6006 fax
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Rita RADABAUGH

    Plaintiff,

vs.

CONTINENTAL CASUALTY COMPANY,

    Defendant.

Civil Action No. C-1-01-705

Judge: Hon. Susan J. Dlott

---

### AFFIDAVIT OF EUGENE TRUCHELUT, M.D.

Before me, the undersigned authority, personally appeared Eugene Truchelut, who after being first duly cautioned and sworn, deposes and says:

1. I am over the age of majority, have personal knowledge of the matters as set forth herein and am competent to testify to these matters.

2. I am a medical doctor specializing in internal medicine.

3. I am a Diplomate of the American Board of Internal Medicine.

4. I have been retained by Continental Casualty Company to independently review the medical records of Rita Radabaugh to determine if they provide objective medical evidence to support her disability claim.

5. I reviewed all of the medical records submitted to me from the administrative record attached to Continental Casualty's Motion for Judgment on the Merits in this case.

6. I have also reviewed all of the records provided with Plaintiff's Submission of Additional Evidence filed in this case as well as the Affidavit of Dr. Ramon Malaya dated July 11, 2003.

7. I submitted a report to Continental Casualty considering my findings following review of the medical records provided with Plaintiff's Submission of Additional Evidence and Dr. Malaya's Affidavit.

8. A true and accurate copy of that report is attached hereto.

9. In reviewing the records, I specifically reviewed the reports of the October 29, 1998 MRI of the cervical spine, the Nerve Conduction and EMG of October 19, 1998, the MRI performed October 12, 1999, Dr. Hawk's physical examination of November 4, 1999, and the November 19, 1999 operative record.

10. The October 29, 1998 MRI of the cervical spine, the Nerve Conduction and EMG report of October 19, 1998, the MRI performed October 12, 1999, Dr. Hawk's physical examination of November 4, 1999, and the November 19, 1999 operative record do not provide objective medical evidence to support Plaintiff's claim of continued disability beyond the initial recovery period for the November 19, 1999 operation because they contain only pre-surgical or surgical objective findings.

11. Such records do not provide objective medical evidence of a post-surgery disability.

12. I also reviewed Dr. Novak's August 21, 2000 letter to Dr. Malaya.

13. Dr. Novak's August 21, 2000 report provided a very detailed physical and neurological examination which revealed slightly increased motor tone on the right side, symmetrical decreased sensory testing below the ankles and spontaneous myoclonic-type twitches affecting the face bilaterally. Dr. Novak felt that the differential diagnosis was extensive, including possible movement disorder or metabolic problem. He ordered additional testing and prescribed pramipexole. Dr. Novak did not provide any definitive cause for Plaintiff's complaints, and his report indicates only that he would pursue additional testing.

14. I also reviewed Dr. Maniar's May 16, 2000 examination.

15. Dr. Maniar's examination was negative. He gave the claimant a trial prescription for Baclofen with plans to send her to Ohio State University for a further opinion if she was not improved.

16. I also reviewed the examination notes of Dr. Malaya from November 1999 through August 2000.

17. Although Dr. Malaya did note that Plaintiff exhibited some neck spasm in the notes of his April 7, 2000 examination, by 6/30/02 Dr. Malaya's exam revealed only tenderness of the head and neck, and on July 14, 2000, Dr. Malaya treated the plaintiff for urinary tract infection and sinusitis. In light of the subsequent findings and the 10/17/00 examination by Dr. Hawk which yielded only a mild degree of intrinsic hand muscle weakness, I do not feel that Dr. Malaya's notations of neck spasms in April 2000 provide objective medical evidence of a disabling condition.

18. Although the claimant reports persistent symptoms post-surgery of her neck and carpal tunnel, there are no physical, radiological or electrodiagnostic findings to support a significant functional impairment.

Further, Affiant Sayeth Naught.

*Eugene Truchelut, MD*
_____
Eugene Truchelut

STATE OF FLORIDA     §
                     §
COUNTY OF            §

Before me, the undersigned, a Notary Public in and for said County and State, personally appeared Eugene Truchelut, M.D., known to me to be the person whose name is subscribed to the foregoing Affidavit and who at the time appeared and acknowledged that he signed this Affidavit as his voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 3rd day of October, 2003.

*Patricia Fitzgerald*
_____
Notary Public



Patricia A. Fitzgerald
Commission # DD 046084
Expires Sep. 10, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

August 6, 2003

To:     Johanna Cobb

From:   Eugene Truchelut, M.D.

RE:     Claimant:    Rita Radabaugh
        Claim #:     2215813

I have reviewed the additionally submitted information. Please refer to my previous report of medical record review on this claimant, dated 07/04/00. The claimant is a 56-year-old woman whose last date of work was on 11/19/99. At that time, she was working as a store manager trainee. Paragraph one of my previous review contains information regarding the claimant's own occupation. For the purposes of this report, I will comment only on records which were not previously reviewed on 07/04/00.

The initial record is the report of an MRI of the head performed on 09/16/98. This was normal, except for evidence of mild sinusitis in the ethmoid and sphenoid areas. Next is a consultation report from a neurologist, Dr. Henry Goodman, on 10/13/98. The claimant was complaining of a ten-year history of loss of the use of her hands with recent progressive numbness of the fingers and weakness of the arms. The physical examination revealed a positive Tinel's sign at the left wrist, abolition of pulses with her arms held at her side and 60 pounds of grip strength in each hand by dynamometer. No muscle wasting was seen. Thoracic outlet syndrome was the chief concern, and Dr. Goodman ordered cervical x-rays and electrodiagnostic studies. The latter were performed on 10/19/98 and were reported by Dr. Goodman to be compatible with left carpal tunnel syndrome, right neurogenic thoracic outlet syndrome and possible C7-C8 radicular disease. Next is the report of an MRI of the cervical spine from 10/29/98. This identified impingement of the anterior subarachnoid space at levels from C3-C4 through C6-78, which was most pronounced at the C5-C6 level secondary to an element of disk bulging and posterior spurring. There was no evidence of focal disk herniation. At a return visit to see Dr. Goodman on 11/12/98, the results of her MRI and electrodiagnostic studies were discussed. Dr. Goodman felt that the scan showed foraminal narrowing to the left at C5-6 with C6 nerve root compression. The claimant had attended physical therapy which "did nothing but aggravate her neck pain." He advised the claimant to stay off of work for one month to rest her arm and also gave her advice about positioning of the arm and use of a carpal tunnel splint. About a month later, on 12/14/98, the claimant returned to Dr. Goodman saying that she had not experienced much improvement. She also reported jerking movements of the right arm with activity, posterior neck pain and dysesthesias in the right arm. The left arm was better. Klonopin was added to her medical regimen, and Relafen was prescribed.

The records from 1999 begin with a visit to Dr. Goodman on 01/14. Some of her symptoms were improved by that time. Dr. Goodman altered the claimant's medication regimen and ordered another nerve conduction study. On 01/22/99, Dr. Goodman remarked that he had given the claimant a ten-pound lifting restriction, but the employer had prevented her from returning to work. MS Contin was prescribed for the claimant's chronic neck and shoulder pain. By the next visit of 01/29/99, Dr. Goodman ordered cervical epidural steroid injections for the claimant's persistent neck symptoms. The claimant had a severe allergic reaction to the MS Contin.

Rita Radabaugh
August 6, 2003
Page Two

There is now an eight-month gap in the records until 09/15/99, when Dr. Goodman performed EMG and nerve conduction studies in the lower extremities. These revealed evidence of a very mild posterior tibial nerve neuropathy, but was otherwise normal. An MRI of the cervical spine was performed on 10/12/99. This revealed bulging of the C5-C6 disk with hypertrophic endplate osteophytic changes and hypertrophy of the ligamentum flavum, causing moderate impingement of the thecal sac at that level. This was thus termed a moderate degree of spinal canal stenosis. Mild neural foraminal stenosis due to uncovertebral spurring was seen at C5-6 and C6-7. At a followup visit to Dr. Goodman on 10/14/99, it was noted that the claimant's somatosensory evoked potential studies of the upper and lower extremities from 10/08/99 were normal. He believed that the claimant's symptoms were secondary to cord irritation (myelopathy) and referred her to a neurosurgeon for a second opinion. Dr. Goodman felt that there was "no explanation for her bilateral posterior tibial nerve neuropathies ..." The neurosurgeon who saw the claimant subsequently, Dr. Thomas Hawk, dictated a to-whom-it-may-concern note on 11/12/99, stating that the claimant would be undergoing surgery on 11/19 and would be off of work for approximately eight weeks postoperatively. A history and physical dated 11/18/99 (I am unable to read the signature) was apparently for preoperative purposes. All the physical examination findings were normal, except for "left C6 radiculopathy - spinal stenosis and carpal tunnel syndrome" under the musculoskeletal and neurological sections. An operative report, dated 11/19/99, documented the claimant's undergoing of an anterior cervical diskectomy and fusion of C5-6 with bone grafting and a left carpal tunnel release. These were performed by Dr. Hawk. It appears that the claimant was discharged from the hospital on 11/20/99. At a return visit to Dr. Hawk's office on 12/09/99, the claimant's sutures were removed, and her incision was described as healing nicely. Her strength had improved in the external rotatory muscles of the left shoulder, but she had decreased sensation over the thumb. At the next visit to Dr. Hawk on 01/11/00, the claimant was still reporting numbness of the fourth and fifth fingers of the left hand and pain in the medial arm. Strength testing was normal in the left upper extremity, and sensation testing was about the same as the right side. Dr. Hawk felt that this was likely related to an ulnar neuropathy, but ordered cervical spine films. On 01/19/00, Dr. Goodman sent a letter to Dr. Hawk noting that the claimant's previous nerve conduction and EMG studies from 10/19/98 had shown normal nerve conduction velocity across the left elbow and right elbow. He was planning to repeat these studies. On 01/28/00, Dr. Hawk dictated a to-whom-it-may-concern note requesting that the claimant remain off of work until approximately 03/13/00, "as she needs to complete a physical therapy program prior to returning to work." Page two of a visit to Dr. Ramon Malaya, the claimant's primary care physician on 02/01/00, showed normal physical examination findings. He ordered an MRI of the lumbar spine due to the claimant's complaints of low-back pain.

On 05/16/00, the claimant returned to see a neurologist seen previously, Dr. Sanjeev Maniar. She was complaining of neck and back pain and dropping objects from her hands. She also complained of dysesthesias about the mouth area. Dr. Maniar's examination was negative. He gave the claimant a trial prescription for Baclofen with plans to send her to Ohio State University for a further opinion if she was not improved. The next visit to Dr. Malaya was on 05/19/00. No specific symptoms were cited on that date, and the examination was entirely normal, including the neurological portion. The diagnoses given on that date were degenerative arthritis and reflux esophagitis. Dr. Maniar sent Dr. Malaya a letter on 05/26/00, stating that the claimant had returned to him with complaints of the side effects from the

Rita Radabaugh
August 6, 2003
Page Three

Baclofen. He next tried her on Artane. At a visit to Dr. Malaya on 06/30/00, the claimant complained of pain in the back of her head. The physical examination was negative, except for tenderness of the head and neck. Dr. Malaya ordered a CT scan of the head and prescribed Lortab. The CT was performed on 07/11/00 and showed only mild atrophy. Other office visits to Dr. Malaya followed on 07/14 and 08/11. These were for followup of her various tests. On the former date, the claimant was treated for a urinary tract infection and sinusitis. On the second, although the claimant's physical examination revealed negative findings, the diagnoses were degenerative arthritis and cardiac arrhythmias. Dr. Malaya filled out an attending physician statement form on 08/18/00 in which he listed multiple diagnosis including degenerative arthritis, spinal stenosis, cervical myelopathy and cardiac arrhythmias. He gave specific physical restrictions on bending, stooping and lifting and described the claimant as being in a class 5 physical impairment status - severe limitation of functional capacity, incapable of minimal (sedentary) activity. An approximate return-to-work date was given as 11/20/00.

In a letter to Dr. Malaya dated 08/21/00, a neurologist at the Ohio State University Medical Center, Dr. Peter Novak, informed him that the claimant had been seen in the movement disorders clinic on that date for evaluation of movement problems over the past ten years. The claimant also complained of leg pain, dysesthesias from the forehead to the extremities, loss of balance and weakness of the hand grip. Dr. Novak's very detailed physical and neurological examinations revealed no abnormalities, except for slightly increased motor tone on the right side, symmetrical decreased sensory testing below the ankles and spontaneous myoclonic-type twitches affecting the face bilaterally. Dr. Novak felt that the differential diagnosis was extensive, including possible movement disorder or metabolic problem. He ordered additional testing and prescribed pramipexole.

There is now a gap of nearly two months in the record, until 10/17/00, when the claimant returned to see Dr. Hawk. His examination at that time noted "some weakness in the intrinsic muscles of both hands of a mild degree, but ... the sensation appears to be back to normal. The C6 dermatome impairment has resolved ... and she has good strength in the proximal muscles, mainly the biceps and external rotators ... The other proximal muscles appear quite strong ..." Examination of the lower extremities was negative and equal bilaterally. Some tenderness was present in the neck area. The claimant said that she felt better since she had not returned to work. Dr. Hawk recommended only further conservative management.

There are no additional records from the year 2000. The next record is an MRI study of the cervical spine performed on 06/13/01, or about eight months after the last progress note from Dr. Hawk. This revealed the postsurgical changes of the C5-C6 vertebral body with improvement in the previously seen anterior subarachnoid space impingement. There was, however, evidence of impingement in the anterior subarachnoid space at C4-C5 and C6-C7 consistent with "some element of disk bulging and/or posterior spurring, and there is some mild to moderate degree of canal stenosis identified" at those levels. There is now another gap, this being three months, until another visit with Dr. Hawk on 09/04/01. The claimant was complaining of persistent occipital cervical pain and unsteadiness. The neurological examination was entirely normal. Dr. Hawk said that there "is really nothing to suggest a myelopathy." There was no hyperreflexia in the lower extremities and no clonus. He reviewed the MRI of the cervical spine and remarked, "I just do not see anything that would lead me to believe that she is a candidate for any surgical

Rita Radabaugh
August 6, 2003
Page Four

intervention. There are some changes above and below the level of the fusion, but I do not think to a point that any further diagnostic testing would be indicated ..." He recommended only symptomatic treatment. Two and half months later, Dr. Terrence Welsh, saw the claimant in followup on 11/15/01. She was complaining of pain in multiple areas, including the posterior neck, lower back, teeth and legs. The latter was aggravated by lying in bed. Other symptoms included dizziness, blurred vision and lightheadedness. Recent carotid Doppler studies were negative. Her physical examination was neurologically intact, and there was no evidence of synovitis. Tenderness was noted throughout the cervical paraspinal muscles, and the cervical range of motion was limited in all planes. Dr. Welsh's impression was persistent myelopathic symptoms without myelopathic signs, status post decompression for cervical stenosis. He remarked, "It has been my experience that this can be quite disabling despite adequate decompression at surgery ... She remains severely disabled, I believe secondary to her surgical myelopathy secondary to spondylitic disease and stenosis. I do not believe she is capable of any sustained premunitive activities at anytime in the foreseeable future." However, he did not think there was much else to do at this point therapeutically.

The next record is 6 ½ months later in the form of a letter to an attorney from Dr. Malaya on 06/05/02. This summarized the claimant's previous evaluation and treatment, as well as her postoperative "intermittent paresthesias involving the skull, face, bilateral arms, legs, hips and bottom of the lip ... She indicates that it may be one body part one time and another body part another time ... She continues to remain severely disabled ..." Over a year later, on 07/11/03, Dr. Malaya signed a physical capacities form which essentially placed the claimant in a sedentary capacity level, although total sitting was limited to four hours per eight-hour workday. In an accompanying affidavit, signed by Dr. Malaya on 07/11/03, he explained and summarized the medical records prior to 10/31/00, including those from other providers (although he also alludes to other records from after that date), and he stated that the claimant was "totally disabled from 11/99 through the present."

To respond to your specific question, in looking at the records prior to the date you asked about (10/31/00), the claimant was complaining of various symptoms after her surgery of 11/99. Some of the evaluating physicians have attributed this to a persistent cervical myelopathy (without the presence of signs of this condition), but a cervical myelopathy would not explain all of the claimant's diffuse symptoms. There are many gaps in the record after 08/21/00, but only one of any significance prior to late October, 2000. This was about two months long. Considering that the 10/17/00 examination by Dr. Hawk yielded a fairly normal physical examination, I am unable to say that there would have been a markedly reduced functional capacity just prior to 10/31/00. Dr. Novak's neurologic examination of 08/21/00 also revealed fairly benign findings, and during the nearly two months that follow this without records, it is impossible to assess exactly what the claimant's status was. Overall, my impression remains the same as that given in the last paragraph of my 07/04/00 report. Considering what is known about the claimant's cervical disk disease, some occupational limitations seem reasonable, such as avoidance of postures which would require extremes in cervical ranges of motion, i.e. climbing and crawling.

Eugene Truchelut, MD
Diplomate American Board of Internal Medicine